UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DAVID BRUEDERLE                                                                                            PLAINTIFF

v.                                      CIVIL ACTION NO. 3:05-CV-818-S

LOUISVILLE/JEFFERSON COUNTY                        DEFENDANTS
METRO GOVERNMENT, ET AL.

## MEMORANDUM OPINION

This case is before the Court on the defendants' motions for summary judgment. David Bruederle was injured during a brief stay in a correctional facility owned by Louisville/Jefferson County Metro Government ("Metro") in 2004. He brought suit under 42 U.S.C. § 1983, alleging violations of the Eighth and Fourteenth Amendments.[1]  Named as defendants were (*inter alia*) Metro, its medical contractor Correctional Medical Services, Inc. ("CMS") and Tom Campbell, Director of the Louisville Metro Department of Corrections. For the reasons stated herein, the Court will grant Defendants' motions for summary judgment.

## BACKGROUND

David Bruederle was accused of assault[2] and booked into a Metro Corrections jail facility at about 6 p.m. on Friday, December 3, 2004. Bruederle had a history of back problems that had led to surgery and subsequent prescriptions for five medications: Hydrocodone, Xanax, Flexeril, Paxil, and Ambien. At booking, Bruederle underwent an initial medical screening at which he informed

---

[1] Bruederle has also stated state-law tort claims against CMS, which remain unresolved.

[2] The charges were later dropped.

Nurse Wyllis Smith[3] of his history and drug regimen. Bruederle reported that he had not taken any of his prescriptions since the previous evening. He also denied any history of withdrawal seizures. Because of his long-term use of pain medication, Smith nonetheless determined that he was a "risk for withdrawal." Under CMS protocol, which takes into account a variety of factors to determine an appropriate level of treatment for withdrawal, Smith deemed that risk to be a relatively minor one that "usually can be managed without medication." (CMS's Ex. 2, CMS Nursing Protocol: Drug Intoxication Withdrawal, at 56.) As a precaution, he was transferred from general population to a medical dormitory reserved for detoxifying inmates.

Drugs are not dispensed to incarcerated individuals without a showing of need. Before an inmate is given medication, CMS and Metro Corrections requires verification of his prescriptions from the inmate's pharmacy. The prescription is then reviewed by a CMS doctor for medical appropriateness before the inmate is provided with his pills. In accordance with this policy, Smith obtained from him a signed form authorizing his pharmacy to disclose information on his prescriptions. While Smith believes that she faxed this authorization to the pharmacy that evening, the cover sheet that appears to have accompanied the authorization form is dated Tuesday, December 7. Even if the fax had been sent immediately, however, the happenstance of Bruederle's arrest date meant that he could not have received any of his prescription medication until (at the earliest) December 6. CMS's physician is present on-site only during the week, so because Bruederle was booked after hours on a Friday, his prescriptions could not have been reviewed until Monday.

---

[3] There is some dispute over the identity of the nurse who completed the screening interview, but Nurse Smith's signature appears on the screening form.

In any event, Bruederle had received no medication by 5:30 p.m. on Sunday, December 5 (about two days after being booked and three days since he reported last having taken his medication), at which time he suffered a violent seizure resulting from withdrawal. He was placed in a restraint chair for his protection and the safety of those treating him. As a result of the seizure, Bruederle suffered compression fractures of three thoracic vertebrae and other injuries. He was released from custody on December 7, 2004.

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of material fact and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Bruederle seeks relief under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Because he was incarcerated not after conviction of a crime, but as a preventive, pretrial measure, the Eighth Amendment's prohibition on cruel and unusual punishment does not directly apply. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Rather, the Fourteenth Amendment's Due Process Clause prohibits infliction of any punishment at all prior to conviction. Because due process "provides similar if not greater protections than the Cruel and Unusual Punishments Clause," it is appropriate to analyze the issues presented here under the Eighth Amendment rubric. *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006) (*citing County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998); *Bell*, 441 U.S. at 545)). *See also Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) (claims under both the Eighth and Fourteenth Amendments "are subject to the same deliberate-indifference standard of care"). For simplicity's sake, the Court will speak in terms of the Eighth Amendment.

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; [these] officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (*quoting Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). *Farmer* laid down the two elements of a successful Eighth Amendment conditions-of-confinement claim. "First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* at 834 (internal quotation marks and citations omitted). Second, the prison official's "state of mind [must be] one of 'deliberate indifference' to inmate health or safety." *Id.* (*quoting Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)).

To prevail in this case, Bruederle must prove an additional element. Defendants here are not the individuals alleged to have denied the plaintiff his medication. Rather, they are Metro, its medical contractor, and the head of Metro Corrections. Because "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," defendants may be held liable only if Bruederle's injuries resulted from an unconstitutional policy or custom of the government entity. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978); *Ford*, 535 F.3d at 495; *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

The Court will discuss each of the three required proofs in turn.

**(1)     "Sufficiently Serious" Deprivation**

The "objective" component of Bruederle's cause of action requires a showing of "serious medical needs." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). That a prisoner's needs are sufficiently serious can be demonstrated either through a physician's diagnosis of the necessity of medical treatment, or by evidence that the medical need was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899-900 (6th Cir. 2004) (*quoting Gaudreault v. Salem*, 923 F.2d 203, 207 (1st Cir. 1990)).

Here, it is undisputed that Bruederle had been prescribed a series of medications, and that not taking them led to his withdrawal seizure and hence to his injuries. It is immaterial that the medication was prescribed for pain rather than for prevention of the seizures that resulted in the injuries for which he seeks to recover. Part of the reason for pursuing a particular drug regimen is the avoidance of potential withdrawal symptoms. We therefore conclude that Bruederle's need for his medication was objectively serious enough to meet this requirement.

**(2)       "Deliberate Indifference"**

For a defendant to be held liable on an Eighth Amendment claim, he must also have a sufficiently culpable state of mind. This requirement is met "only if [the official] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847 (*quoted in Spencer*, 449 F.3d at 729). Actual knowledge of the risk of harm is required, but such knowledge may be inferred "from the very fact that the risk was obvious." *Id.* at 842. This prong demands more than mere negligence; a conscious disregard of a known substantial risk of serious harm is required. *Id.* at 839; *Brooks*, 39 F.3d at 128.

In this case, it is clear that various nurses and prison employees were aware that Bruederle was at some risk for withdrawal. That was Nurse Smith's conclusion after her initial screening interview, and it was the basis for his transfer to the medical dormitory. The evidence does not show, however, that anyone was aware of a serious risk of the kind of violent seizure that overtook the plaintiff and caused his injury. CMS's classification protocol rated Bruederle as being likely to suffer only symptoms that can be managed without medication. He neither exhibited nor complained of any signs of withdrawal before the onset of his seizure. He did report that he was experiencing pain, but this was a normal consequence of not having taken painkillers rather than an indication of withdrawal. Bruederle's reports of pain therefore would not have alerted prison staff to the risk of seizure. Because the nurses were not actually conscious of a risk of seizure, they could not have disregarded it. Perhaps they should have been aware of this risk, but the deliberate-indifference standard affords no relief absent actual knowledge of a severe risk of harm. *See Farmer*, 511 U.S. at 839; *Brooks*, 39 F.3d at 128.

Moreover, defendants did not consciously disregard the moderate withdrawal risk with which they thought themselves confronted. Nurse Smith noted Bruederle's risk of withdrawal in her report following his screening, and responded by referring him to the physician and recommending that he be housed in the medical dormitory. These measures were designed to enable the staff to monitor his symptoms and react promptly in the event of the onset of serious withdrawal. The jail staff thus appears to have responded appropriately to the risks of which they were actually aware.

In the Court's view, Bruederle has failed to establish a genuine issue of material fact as to whether defendants acted with deliberate indifference as to the risk of him suffering the kind of withdrawal seizure that ultimately caused his injury. Neither CMS's nor Metro Corrections' staff was actually aware of any serious risk of harm, and they therefore could not have consciously disregarded it. There being no showing of deliberate indifference, summary judgment for defendants is appropriate.

**(3)** **Unconstitutional Policy or Custom**

Even supposing that Bruederle had made out a claim of deliberate indifference, summary judgment for defendants is warranted because he has failed to show a policy or custom that could serve as the basis for holding these institutional defendants liable. Apparently conceding that there is no official policy for him to challenge, Bruederle alleges that defendants have a general custom of always denying certain prescription medications (such as hydrocodone and Xanax), that this custom is unconstitutional, and that it caused his injury. This argument fails.

A "custom" for purposes of the § 1983 liability of a city or its agency must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Doe v. Claiborne County*, 103 F.3d 495, 507-508 (6th Cir. 1996) (*quoting Monell*, 436 U.S. at 691)). That is, "a 'custom' is

a 'legal institution' not memorialized by written law." *Id.* (*citing Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir.), *cert. denied*, 510 U.S. 826 (1993)). For a municipality to be held liable, the custom itself must be unconstitutional and must have caused the plaintiff's injury. *Ford*, 535 F.3d at 495.

Bruederle does present some testimony to the effect that, generally speaking, inmates are not given medications that carry the potential for abuse. Nurse Smith testified, for instance, that "[i]t's very unusual . . . for [hydrocodone] to be given in the jail," and that she "cannot recall anybody getting hydrocodone in the jail." (Smith Dep. 24.) She also indicated that she could not recall any inmates receiving Xanax, although another medication (Librium) was sometimes substituted. (*Id.* at 25.) Similarly, Nurse Jenese Joyner testified that in her experience, certain medications, including hydrocodone, Xanax, and Ambien, were not typically prescribed in jail. (Joyner Dep. 12-13.) A third nurse, Cindy Payne, testified that "at that particular time in the jail we did not give Xanax," and that she did not know whether hydrocodone would have been prescribed. (Payne Dep. 18-19.) Crucially, though, Payne acknowledged (as did the other nurses) that ultimately a physician is responsible for prescribing and approving medications. She did not recall ever being told that certain medications were not to be prescribed, but only that "[t]he doctors never prescribed [them]." (*Id.* at 21.)

Because writing or approving a prescription is a medical decision, ultimate responsibility falls on a facility's doctors. The evidence does not show that CMS's doctors were prohibited from prescribing certain medications. When asked if "drugs of abuse" are simply "not given at Metro Corrections," Dr. Lawrence Mudd (the only corrections doctor whose deposition is on file) responded: "Well, that's a sweeping generalization. . . . I can't say that's the case." (Mudd Dep. 49-50.) Rather, the realities of the prison environment weigh so heavily against allowing access to drugs

-8-

with the potential for abuse that prescribing them is hardly ever justified. The Supreme Court has observed:

> [T]he Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees. Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.

*Bell*, 441 U.S. at 540 (footnote omitted). Because certain drugs are susceptible to recreational use, pills introduced into the jail environment quickly become used as currency bartered for other contraband. This gives them added value and can lead to violence. Such drugs are therefore rarely prescribed due to the significant countervailing interests in prison security and safety. (Mudd Dep. 50.) But that does not mean they are prohibited from ever being prescribed. Further, comparable substitutes are often available to inmates in cases where the "drug of abuse" is not justified—for instance, Librium was typically prescribed in place of Xanax. (*Id.* at 48.)

Bruederle cannot prove the existence of a custom rising to the level of a "legal institution." The prison setting necessitates caution in prescribing certain drugs, and the evidence indicates that the ultimate decision regarding what to prescribe in a given instance is left to the doctor's judgment. Bruederle cites no evidence that higher-ups in CMS or Metro Corrections approved or were even aware of the actions taken by the doctors and nurses working for them. It may be the case that CMS or Metro employees were negligent in not providing him with medication sooner than they did. Indeed, for sake of argument we may suppose (though we explicitly do not decide) that they were deliberately indifferent. But those acts would have been unconstitutional applications of a permissible policy, rather than acts in conformity with an unconstitutional policy. Recovery against

the defendants involved in the present set of motions would therefore not be permitted, even assuming the deliberate indifference of their employees.[4]

A separate Order will be entered in accordance with this opinion.

Charles R. Simpson III, Judge
United States District Court

---

[4] Arguably, a cause of Bruederle's injuries was the fact that no doctor was present at the jail to review his prescription and thereby to allow him access to medication before his seizure. However, Bruederle does not allege that the policies of requiring approval for medication and of staffing doctors only during the week are unconstitutional. We see no need to address them here.

-10-

December 17, 2009